Good morning, your honors. Good morning. Evangelo Arvanites, on behalf of Jaime Martinez-Huertas, and I'm from Great Falls, Montana, as an assistant federal defender. Well, why don't you just jump right to it? I think that we know what the, I think we know the facts here. Why don't you, I think everyone talks in their briefs about the, sort of the alligator in the bathtub, the United States v. Godino. Yes. Tell me why that's not dispositive of your issue. That's a good question, your honor, and that is kind of the alligator in the bathtub. We focused upon the 8th Circuit case, and the, what the 8th Circuit case, Guevro-Martinez talked about was splitting Lopez Mendoza in two, essentially, because there were two defendants. One was a deportation civil issue, and he was trying to suppress his identity. The other, Sandoval Sanchez, was simply trying to suppress not just his identity, but the evidence that led to his identity. And the 8th Circuit case of, of, of, of Guevro-Martinez held that the identity should be suppressed. Well, we have a 9th Circuit case, though, and so if, if that 9th Circuit case is not distinguishable, then the only way that we can give you the relief you're asking for is to go on bonk. Is that what you're asking, or what is, or do you, you know, I'm having a hard time distinguishing it. Sure, I understand. With, and there's a dicta in del, del, del Toro-Godino that discusses this reasonable suspicion that the counsel for del Toro-Godino stated wasn't there, but the court stated that there was reasonable suspicion there, that it was late at night, these people were either intoxicated, they were transient, they were evasive. That is very different from Mr. Jaime Martinez-Lartes' case, who was eastbound on an Amtrak train, and just so happened to be in Havre, Montana, for a 15-minute gas stop, eating beef jerky. Not a lot of reasonable suspicion there, and it's … And you, aren't you contending that the customs agent should not have had the authority to go up and talk to him at all? Is that your position? Well, my position is that under 8-1357, which I cite in my brief, the Border Patrol has the authority within a reasonable distance from the border to enter a bus or a train. And what the court did in its ruling was cite Minky, U.S. v. or Minky v. United States. There are several cases that essentially enlarge Minky, because Minky didn't talk about reasonable suspicion. It just simply talked about it is reasonable to search for aliens within a reasonable distance, which under 287.1 of the CFR is about 100 miles. And so what Bregoni-Ponce, for example, what Almeda-Sanchez talks about is there has to be some reasonable suspicion that a roving Border Patrol officer can't simply drive around like an Almeda-Sanchez and accost someone or stop someone on a highway that isn't even connected to the border. It is parallel to the border. It never intersects the border. But in a prior case, the officer was driving, I think, going the other way and saw the two fellows sitting on the curb, wasn't that it? In Del Toro, Godino? Yes, in an alley or something. Wheeled around and started talking to them. Yes. The very thing that you say we should preclude in this case? Well, again, the circumstances in Del Toro, Godino were different. It was late at night. These people were transient in appearance and they could, the police can come up and certainly do a consensual encounter. But we're contesting that this is more of an investigative stop as opposed to a consensual encounter. But getting back to my point that Almeda-Sanchez, the road runs east and west just like the Amtrak. And even though it's within 20 miles of the border, it is 20 miles continuously along the border. And so there's no connection. There's no reasonable suspicion why the officer should even be at the Haver station on the train because there's no confluence, if you will, to create some sort of reasonable suspicion why there would be aliens on board that train. We look at most of these cases are out of or near Mexico as well. This is a Canadian border. Think about Detroit, which is essentially within 100 miles of the Canadian border. Can Border Patrol board any trains within 100 miles of the border in Detroit simply to come up to people randomly, just like the roving, quote, unquote, patrol officer did in Almeda-Sanchez, and stop people? We believe that. Answer the question. I'm going to be real clear on this. Under your argument, at what point does the officer have to have reasonable suspicion? Right at the beginning, before he even approaches the person at that point? Well, he has to have a reasonable, a reason to be on the train or a reason to stop the passenger or the car. And so that, you know, our contention is he shouldn't have even, they shouldn't have been allowed to simply sit on a train every day and go through the train and stop people and talk to people. And as Agent Jensen says in my brief, I think on excerpt page 11 or 12, and simply, you know, wait on the platform to watch people come off the train who may be getting off the train because the Border Patrol agents are going on a train. You know, clearly, if you read, when you read, and you have probably read the Agent Jensen's testimony, he says that he talks to these people to investigate, to find out if the accent is different in any way, and goes along and talks to them and keeps talking to them and walks with them. This is beyond the pale of... Should we be ruling that officers cannot talk to citizens unless they have reasonable suspicion? No, no, I know. The issue I think is germane to this particular case. These people are simply going on an Amtrak train during a 15 minute stop and talking to people randomly, just like the roving patrol officer in Almeida Sanchez. It just has nothing to do with the border. Well, how will we know when officers can talk to people? If it, I mean, they need some sort of bright line rule. And here, what you're saying is don't talk to people unless you have reasonable suspicion. That's what, that's what I'm hearing is the bright line rule here. I think you can, I think talking to people for simply not an investigatory situation, but a consensual encounter. I think one can talk to people, but the impetus of why the patrol officer was on the train. But you're saying you don't even want him to be on there, even though anyone could be on the train. Well, right. I mean, they're on the train to do investigations, to bust people for alien problems. And again, this isn't Mexico. This isn't near Mexico. This is Canada. Well, do you want to save two minutes for a rebuttal or? Yes, I do. All right. Good morning. I'm Betsy Horstman, Elizabeth Horstman from the District of Montana, representing the government. Morning. Good morning. In this particular case, the defense has alleged that reasonable suspicion to commit a crime in his brief alleged initially that reasonable suspicion to commit a crime was required. However, the law is very clear, and there's a long list of cases, starting with U.S. v. Wood, Florida v. Royer, U.S. v. Drayton, Mueller v. Mina, and both of those latter two cases rely on the U.S. Supreme Court of Florida v. Bostick. And in those cases, it's very clear that officers do not need reasonable suspicion to engage in casual, consensual conversations with people as they encounter them. And in this particular case, the Border Patrol agents were acting in a routine transportation check. They boarded the train. They asked questions. In this particular case, the defendant was very clear to leave. Does it make any difference whether the appellant believed he was not free to ignore the agent's questions? I think it matters whether a reasonable person would believe he was unable to ignore the agents. In this particular case, a reasonable person would not have felt that they could not ignore the agent. In other words, the agent, the record is clear that the agent stood to the side of the defendant, that the defendant was sitting at the front part of the train. He could have walked out. The agents also testified that based upon their training at United States Border Patrol Academy, as well as their individual practices, that it was their practice not to stop somebody if they decided they didn't want to engage in conversation with the agents. Therefore, a reasonable person in this instance would not have felt that they were going to. So did the district court find that to be, was that a factual finding, that a reasonable person or the objective standard, was that a finding of the district court that would be entitled to deference, a factual finding? The court found specifically at excerpts of record on page 15, page 49 of the transcript, he found that the initial encounter between the agent and the defendant was not an arrest. I'm sorry, which page of the transcript? Page 49 of the transcript, which is page 15 in the excerpts of record. Yes, go ahead. It says, I find the initial encounter between the agent and the defendant was not an arrest, but rather a question-and-answer type encounter. There was no indicia of arrest at this point in time. There was no deprivation of liberty of the defendant in any way, whether the defendant may have had some apprehension of being encountered by a uniformed officer. I find not to be determinative of the issue before the court. But it is clear under the law that the officer was entitled to carry out his duties and responsibilities under United States Code, Title VIII, Section 1357, and that he was doing so only, doing only that which the law permitted him to do. So in this particular case, the court did make a finding that the defendant was not under arrest until probable cause had not been stopped, until probable cause was established that he was an alien and that he had no record or no document. Of course, not being under arrest isn't – doesn't – when you're under arrest, you aren't free to leave. But you might not be free to leave some point prior to being under arrest, too, right? Right. And I – that's a good point. But in this particular case, again, the officers, based upon their training, their practices, both – both officers testified similarly as to their training and their practices that they do not detain people until they feel that they have belief that this person is an alien and that they – Well, I realize that that was their testimony. My question was, did the court make a factual finding that he was free to go? I don't see it exactly. I see it close there, but not exactly. Well, I believe that that excerpt which I read is the – is the finding by the court that the defendant was not under arrest or that he did feel that he was free to go. I would also point out, in this case, the defendant's own testimony, which, as found in the record, indicates that he did not make any attempt to leave, and also that when he was asked on direct examination with a leading question, which – did you feel that you could ignore his question, were you intimidated by his uniform, those answers were yes. And then on cross-examination, it was clear that – first, that the defendant stated that he was not intimidated by the uniform, but rather he was intimidated by the fact that if he were caught, that he would be sent back to Mexico. Question, so you were afraid of the consequences. You were not afraid of the agent, correct? Yes. And so in this instance, he was not afraid of the agent. He was not put in a position where the agent in uniform with a sidearm did anything to him. And that's because an officer is in uniform, has a sidearm on – I mean, holstered without any sort of brandishing. The mere fact that he's in uniform asking questions does not render the person unable to leave. All right. Thank you. Thank you very much. Ms. Horstman, suppose you were the person sitting in that seat on the train. Is this the guy on the train? An officer comes up and says, how are you? And you say, fine, where are you going? Do you think that you would really feel free to say, well, I'm not going to answer your questions and get up and walk away? I mean, I think when an officer comes up to you and starts questioning you – I know our cases talk about the person was free to leave, there was nothing impairing his movement, and the officer moved to the side and all this other kind of stuff. But I wouldn't feel that way if an officer started talking to me. I think it would take a very tough kind of person to say, well, I don't have to talk to you. Is that really part of this inquiry? I guess it is. I think it is. And I think that it all boils down to what is a reasonable person. And you ask, if I would – Maybe you and I are unreasonable people. It could be. And I think that the law has said, and I don't have a citation for it, but a reasonable person is a reasonable innocent person. So in this instance, where an officer comes up and talks to us – I've given my career over to law enforcement, so a law enforcement officer talking to me is not going to have that sort of impact where I would feel I would not want to engage in conversation. So in this instance, the law is clear that just because an officer goes to talk to somebody, if they decide not to speak to them, unless there's some other indication that they're being held there or that the response was mandatory, the courts have said uniformly that – Well, it's something that we always – you know, we talk about in our cases, but I don't think it means very much. It's probably simply the law that these Border Patrol people have the right to go up and have inoffensive conversations with people, and that's their right. Whether the person thinks he's free to leave or not, I don't know that so much, but I will talk about it in this case and probably adopt your analysis. It seems to be very good. But anyway, that's just a comment. Thank you, Your Honors. Thank you. Thank you. Thank you for allowing me to have two more minutes, I appreciate that. These officers were in uniform and they essentially put a dragnet out – you know, one guy on the platform, two on the train, one on each side, and whoever got off the train as Agent Jensen says in the excerpts of the record around page 11, that he would catch them, basically, and talk to them and walk with them. Very interesting. The other issue is that the judge made no factual findings here about just the issue that Your Honor talked about concerning whether he was free to leave or not, because – and it gets back to my issue with the fact that the judge was tied to Menke, which doesn't explore the interesting gray area of reasonable suspicion that Bregoni-Ponce and Amita Sanchez explores, which are cases after that which talks about the reasonable suspicion. So he felt that it wasn't even important to discuss that they were allowed to be there and that's the end of it. I mean, according to the court's eyes, and we believe that was an error. Are there any other questions? There don't appear to be further questions. Thank you both for your arguments. This matter will now stand submitted. United States of America v. Francisco.
judges: Thompson, Tashima, Callahan